UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CHRYSLER REALTY COMPANY,
LLC,

      CASE NO. 06-CV-11785

    Plaintiff,

      PAUL D. BORMAN
-vs-      UNITED STATES DISTRICT JUDGE

DESIGN FORUM ARCHITECTS,
INC.,

    Defendant.
_____/

**<u>AMENDED OPINION AND ORDER
GRANTING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT[1]</u>**

  Before the Court is Defendant Design Forum Architects, Inc.'s, (a/k/a Design Forum Architecture, Inc.) ("Defendant") October 18, 2007 Motion for Partial Summary Judgment. (Doc. No. 23). Plaintiff Chrysler Realty Company ("Plaintiff") filed a Response on December 3, 2007. The Court held a motion hearing on January 31, 2008. Having considered the entire record, and for the reasons that follow, the Court GRANTS Defendant's motion.

**I.  BACKGROUND**

  This diversity case arises from Plaintiff's allegations that Defendant breached its contract with Plaintiff in connection with the construction of an automobile dealership in Las Vegas, Nevada. Plaintiff is a Delaware corporation, with its principal place of business in Michigan.

---

[1]   The only change from the original February 28, 2008 Opinion and Order pertains to a clerical error on final page, where the Court should have stated: "grants summary judgment to Defendant on Complaint paragraphs 20, 32, 43, 45-47, 50, <u>52</u>, 55(a)-(f), (h), (i), (m), 56, 59(b) & (e), and 60."

1

(Compl. ¶ 1). Defendant is an Ohio corporation, with its principal place of business in Ohio. (Compl. ¶ 2).

Plaintiff sought Defendant's services in connection with the construction of the Integrity Chrysler/Jeep-Dodge dealership in Las Vegas. (Compl. ¶ 5). Plaintiff sought to expedite the project in order to complete the dealership before the February 2004 Dealer Announcement Show. (Compl. ¶ 7). This planned "Alpha" dealership housed the Chrysler, Dodge, and Jeep brands under a single roof. (Def. Br. Ex. A, Larry Jordan Dep. 5, 19, 23-24). The dealership was to be constructed on land owned by Thomas Saitta. (Def. Br. Ex. C, Saitta Dep. 6). Once the project was completed, Saitta and Greg Bashant were either to purchase or to lease the facility from Chrysler. (Larry Jordan Dep. 36; Saitta Dep. 22, 45).

Plaintiff contacted Defendant in order to procure architectural and engineering services in connection with the planned dealership. To complete the dealership on schedule, Plaintiff compressed the construction schedule from 18 to 24 months to 5 ½ to 6 months – in order to complete the work by January 15, 2004. (Larry Jordan Dep. 130-31). Plaintiff retained Lusardi Construction Company as general contractor and the Jordan Company as the construction manager. (Compl. ¶ 6). Larry Jordan acted as owner representative for the project for Plaintiff. (Larry Jordan Dep. 19). Lewis Jordan performed the duties of construction manager and reported developments to Larry Jordan. (*Id*. at 28-29; Def. Br. Ex. B, Lewis Jordan Dep. 10).

The central dispute in the case involves whether certain HVAC (heating, ventilation, air conditioning) systems designed by Defendant for portions of the dealership were inadequate.

Plaintiff and Defendant executed a Purchase Order and a Design Forum Contract. The Purchase Order provided Defendant $582,800, including reimbursable expenses, for its work on

the project. (Compl. Ex. A, Purchase Order).

On June 3, 2003, Defendant e-mailed to Plaintiff an assessment of the cooling load for the proposed dealership. (Def. Br. Ex. K, 6/03/03 E-Mail; Def. Br. Ex. I, Whisman Dep. 64-65). Defendant calculated a cooling load of 260 to 275 tons, based upon an outside temperature of 108 degrees. Chris Whisman of Defendant proposed the following design approaches to the project, explaining the advantages and disadvantages of each: (1) multiple split systems; (2) multiple heat pumps; and (3) packaged rooftop units. (6/03/03 Email).

Plaintiff responded that it had recently finished a dealership in Houston, Texas of a similar size with cooling loads of only 163.5 tons, and offered those designs to aid Defendant. (Def. Br. Ex. F, Harding Dep. 70-72; Def. Br. Ex. G, Arakelian Dep. 73; Whisman Dep. 32; Def. Br. Ex. CC, 6/4/03 Fax). The Houston facility used split systems, and not evaporative cooling. (Whisman Dep. 32). Plaintiff also advised Defendant that its design criteria ruled out the use of rooftop units, because of the inherent difficulty in maintaining them. (Lewis Jordan Dep. 56-57; Harding Dep. 101-02; Whisman Dep. 56). Plaintiff instead instructed Defendant to place any condenser units in enclosed outside mechanical yards.

On June 23, 2003, the parties executed a contract governing the project (a modified version of a standard agreement). (Compl. Ex. B, Design Forum Contract). The contract contained the following clauses that are central to the instant dispute:

> 1.2.2.7 The Owner shall provide prompt written notice to the Architect if the Owner becomes aware of any fault or defect in the Project, including any errors, omissions or inconsistencies in the Architect's Instruments of Service.
>
> 1.3.4.1 Any claim, dispute or other matter in question arising out of or related to this Agreement shall be subject to mediation as a condition precedent to arbitration or the institution of legal or equitable

>     proceedings by either party. . . .
>
> 1.3.4.2 The Owner and Architect shall endeavor to resolve claims, disputes and other matters in question between them by mediation which, unless the parties mutually agree otherwise, shall be in accordance with the Construction Industry Rules of the American Arbitration Association. . . . .
>
> 1.3.8.1 This agreement may be terminated by [Defendant] or [Plaintiff] immediately upon written notice to the defaulting party in the event of Default by such party. For the purposes of this Agreement, "Default" means either of the following:
>
>> A. In the event a party . . . . materially breaches this Agreement, any other party may give the breaching party written notice of such breach. The non-breaching party may then terminate this Agreement by written notice if the breaching party does not cure such breach within 30 days after the receipt of notice of breach, or, if the breach is not capable of being remedied in 30 days, the breaching party fails to commence the cure within 30 days, and diligently pursue the curative action to completion within a reasonable time.

(*Id.*).

On July 9 and 10, 2003, representatives from Plaintiff, Defendant, and others involved in the dealership project met in Dayton, Ohio. (Larry Jordan Dep. 23). During these meetings, the topic of HVAC and evaporative cooling was briefly raised. (*Id.* at 38, 60-61, 65). Lewis Jordan testified that at the meeting, he privately disclosed his reservations about evaporative cooling to Larry Jordan. (Lewis Jordan Dep. 23-24). Lewis Jordan further indicated that when asked about the ability of evaporative coolers to perform the required function, Chris Whisman of Defendant became "defensive." (*Id.* at 26, 47). Whisman admitted to becoming defensive, faced with "accusations" from Plaintiff's principles about Defendant's work on the project. (Whisman Dep. 112-13). During this meeting, Plaintiff's representative stated that it would be "satisfied" if Defendant could design a system that maintained an 80-82 degree temperature on a day when the

outside temperature was 100 degrees. (Larry Jordan Dep. 48-49, 56; Def. Br. Ex. N, Meeting Minutes 6). Brady Harding, a project architect for Defendant, noted that the requirement was 85 degrees for a 100 degree day. (Harding Dep. 61-62). Gregory Arakelian of Defendant recorded the desired temperature of 83 degrees. (Arakelian Dep. 83).

After reviewing the proposals, Plaintiff directed Defendant to go ahead with: (1) split heat pump systems with multiple compressors and condensing units located in exterior walled mechanical yards, with supplemental electric heating; and (2) evaporative cooling units mounted on the overheard ceilings with gas furnaces for the service building. The more expensive refrigeration HVAC system was used for the showroom and sales section of the facility. Additionally, Plaintiff instructed Defendant to ignore any input from Saitta, or any other dealership representatives. (Harding Dep. 68-69; Def. Br. Ex. O, 7/25/03 E-Mail).

To provide air conditioning to the dealership service area, Gregory Arakelian of Defendant testified that Larry Jordan instructed Defendant to look at evaporative cooling systems. (Arakelian Dep. 74, 77). Defendant was under the impression that evaporative cooling typically functioned well in dry heat areas. (*Id*. at 88). Arakelian testified that there were no more conversations regarding the HVAC systems. (*Id*. at 98-99).

Plaintiff alleges that Defendant's designer of the HVAC system, Whisman, was not licensed in the State of Nevada to sign mechanical engineering documents, had no formal education or seminar experience regarding evaporative cooler systems, and had little experience working on projects in Las Vegas or involving dealerships. Further, the State of Nevada fined Jim Taube, a civil engineer for Defendant who reviewed and signed off on Whisman's designs, for his signature on design documents, since he was not a licensed mechanical engineer. (Def.

5

Br. Ex. H, Taube Dep. 48, 100-01)

Plaintiff contends that Larry Jordan did not dictate what type of system that Defendant should use in the dealership. Larry Jordan testified that he questioned Defendant's employees at the time on the propriety of using an "outdated" evaporative cooling system for the integrity project. At his deposition, Larry Jordan requested that Defendant do more research on HVAC systems used in Las Vegas before committing to the evaporative cooling system. (Larry Jordan Dep. 23-24, 47).

Defendant contacted two manufacturers in Las Vegas about evaporative cooling systems. (Whisman Dep. 43-45). Whisman testified that he contacted the manufacturer Trane, and that Trane informed him that evaporative cooling would work for the project. (*Id*. at 44-45). However, Whisman did not inform Trane of the desired target temperature. (*Id*. at 46). Defendant represented to Plaintiff that its evaporative cooling system would keep a temperature of 74.3 – 76.3 degrees based on a 100-degree outside temperature, and 82.6 – 84.6 degrees with an outside temperature of 106 degrees. Defendant ultimately recommended an evaporative cooling system for the service area, with Plaintiff's approval. (Larry Jordan Dep. 62-63, 68-69, 72, 214-15).

On October 20, 2003, a second Purchase Order was issued permitting Defendant to increase its maximum contract price of $117,325 for performing on-site supervision of the construction. (Compl. Ex. C). Defendant agreed to provide on site construction observation five days per week (40 hours) from October 6, 2003, until January 15, 2004. (*Id*.).

Larry Jordan stated that since "the time frame was so condensed and we blew all of our submission deadlines, the project was piecemeal. . . . So we never got the entire package in its

6

entirety until after the commencement of construction." (Larry Jordan Dep. 44:1-5). He additionally indicated that Defendant did not meet any of its submission deadlines throughout the project. (*Id*. at 216). Jordan further informed Harding that four of Plaintiff's executives had been fired over the last prototype dealership built, and that Jordan was "not going to be one of them." (Harding Dep. 132).

The dealership was completed by the January 15, 2004 deadline. The dealer took possession of the building and assumed responsibility for its maintenance.

By April 2004, as the climate in Las Vegas started to warm up, employees of the dealership started to complain about the adequacy of the evaporative coolers in the service building. Bob Beehler, Plaintiff's real estate agent, called Larry Jordan and informed him that "we need to get this system fixed or we're going to have to close the dealership." (Larry Jordan Dep. 78:2-3).

In early May 2004, as outside air temperatures began to reach 101-02 degrees, Larry Jordan testified that the temperature in the service area rose to 95 degrees. (*Id*. at 77). The owner of the dealership told Larry Jordan informed him that the service area was "hot and humid." The mechanics' tools purportedly started to "rust." One of the dealership's mechanics walked off the job, and others threatened to follow. (Lewis Jordan Dep. 97; Saitta Dep. 37-38, 41; Def. Br. Ex. D, Bashant Dep. 62).

By May 11, 2004, Plaintiff had contacted Lusardi Construction to install temporary cooling units in the service area. (Larry Jordan Dep. 75-76). The temporary cooling units did not succeed in cooling the service area. (*Id*. at 80-81; Lewis Jordan Dep. 83-84). Larger temporary

7

units were subsequently brought in, but they also failed to cool the area sufficiently. (Larry Jordan Dep. 103-04).

Plaintiff did not provide Defendant any notice of any of the HVAC problems, pursuant to the contract. (Larry Jordan Dep. 87-88, 188; Lewis Jordan Dep. 114). Larry Jordan indicated that the decision not to contact Defendant was made by Thom Noles, Plaintiff's senior manager, and stated that "at that time, [Noles] has just terminated another contract with . . . . [Defendant and that] he just did not want to entertain it." (Larry Jordan Dep. at 88:6-8). Larry Jordan explained that it was his "marching order" to get the system fixed. (*Id*. at 96). The owners of the dealership similarly had no contact with Defendant about the HVAC problems. (Bashant Dep. 110).

Engineer William Petty, of Petty & Associates, was hired initially to assess the cooling problems, and then to design a replacement system. On May 26, 2004, Petty performed an inspection of the HVAC systems. (Larry Jordan Dep. 107-08). By May 28, 2004, Petty had been hired to replace the evaporative cooling system with a chilled water system. (*Id*. at 112).

By June 5, 2004, Petty had modified the evaporative cooling system, and added a temporary chilled water unit for the service building. At this point, Lewis Jordan indicated that Plaintiff had "not giv[en] up on th[e evaporative cooling] system yet." (Lewis Jordan Dep. 122). That solution purportedly did not alleviate the cooling situation. Petty also observed that trash had been collecting in the exterior mechanical equipment enclosure, sticking to the condenser coils.

Petty produced a report to Plaintiff on July 19, 2004, documenting perceived design, construction, and installation problems for the evaporative cooling system. (Def. Br. Ex. Z, Petty Report). By July 28, 2004, Petty had completely replaced the original evaporative cooling

system. The original equipment was discarded, with the exception of the heating furnace portion of the system.

By August 2004, Petty also overhauled the HVAC system for the sales building by: (1) replacing the original solid walls in the mechanical yards with louvered walls; (2) adding water misters to cool the compressors; (3) replacing all twelve compressor units / condensing units; and (4) adding supplemental mechanical systems. The twelve compressor units were discarded.

In September 2004, Plaintiff requested that Petty prepare a revised edition of his July 19, 2004 report enumerating the alleged defects in Defendant's original design and specifications. On September 16, 2004, Petty provided the updated report to Larry Jordan. (Def. Br. Ex. AA, Petty Report).

On November 11, 2004, Plaintiff sent a letter to Defendant incorporating Petty's claims of alleged design defects and demanded compensation in the amount of $1.4 million dollars. (Def. Br. Ex. BB, 11/11/04 Letter). This letter was the first written notice that Defendant received regarding problems at the Integrity dealership. The letter detailed the following alleged problems with Defendant's work on the project: (1) mechanical equipment storage yards allowing inadequate cool airflow into the condensers; (2) the vehicle delivery center and sales management office had inadequate airflow; (3) the service write-up area had inadequate cooling, contained no heating, and evaporating systems that simply added moisture without changing the temperature; (4) the filters in the showroom's first floor were difficult to access and too small for their purpose; and (5) the service building's cooling system was inoperative and unsatisfactory.

On September 13, 2005, Plaintiff and Saitta entered into a purchase agreement for the dealership. (Saitta Dep. 43).

As of May 18, 2007, Bashant testified that in his opinion the main sales office, showroom, and offices portion of the dealership were still suffering from inadequate HVAC systems. (Bashant Dep. 49-52).

On April 13, 2006, Plaintiff filed the instant Complaint, asserting the following causes of action:

Count I: Breach of Contract
Count II: Professional Liability
Count III: Unjust Enrichment

Plaintiff alleges that Defendant breached the contract through in the following ways: (1) deficient design of the air conditioning system in several portions of the dealership; (2) deficient design of overhead doors in the Service Building and Showroom; (3) lack of cooperation, experience, and delayed project work; and (4) failure to perform on-site supervision; and (5) failure to process and expedite Requests for Information ("RFIs") from the general contractor.

Both sides retained experts on the effectiveness of Defendant's HVAC designs. Plaintiff retained Petty to testify as both a fact and expert witness. (Pl. Br. Ex. A, Petty Expert Report). Defendant retained Michael J. Wintheiser. (Pl. Br. Ex. B, Wintheiser Expert Report).

On October 18, 2007, Defendant filed a Motion for Partial Summary Judgment. In particular, Defendant seeks summary judgment on the following paragraphs of the Complaint: 20, 32, 43, 45-47, 50, 52(a)-(f), (h), (I), (m), 56, 59(b) & (e), and 60-66. Defendant contends that: (1) Plaintiff cannot maintain an unjust enrichment claim due to the existence of an express contract between the parties; (2) the breach of contract claim based on the HVAC system must be dismissed since Plaintiff intentionally destroyed the system before the litigation; (3) Plaintiff materially breached the contract first by failing to notify Defendant of the HVAC problems and

not allowing Defendant the opportunity to inspect or repair the systems; and (4) claims of failure to meet the project deadline fail because the project was completed on time.

## II. ANALYSIS

### A. Summary Judgment Standard

The United States Court of Appeals for the Sixth Circuit has summarized the relevant legal standard for a summary judgment motion:

> Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In reviewing a motion for summary judgment, we view the evidence, all facts, and any inferences in the light most favorable to the nonmoving party. "To withstand summary judgment, the non-movant must show sufficient evidence to create a genuine issue of material fact." A mere scintilla of evidence is insufficient; "there must be evidence on which the jury could reasonably find for the [non-movant]."

*Thomas v. Speedway SuperAmerica, LLC*, 506 F.3d 496, 500-01 (6th Cir. 2007) (internal citations omitted).

### B. Breach of Contract

Defendant argues that Plaintiff cannot maintain its breach of contract claim since Plaintiff failed to provide the required notice and opportunity to cure the alleged defective work. It is undisputed that Defendant was unaware of any problems with the HVAC systems at the Integrity Dealership until notified by letter on November 11, 2004 – well after Plaintiff initiated its own remediation work, commencing in May 2004.

Plaintiff makes two arguments in response: (1) it was not obligated to provide notice since the contract "was completed as of the date the dealer took possession of the dealership in February 2004"; (2) since Plaintiff notified Defendant in November 2004, the only issue is

whether that notice was "prompt." (Pl. Br. 18-19). Neither of these arguments have merit.

The Sixth Circuit has recognized that the first party to commit a substantial breach of the contract cannot maintain a breach of contract action against the other party:

> "He who commits the first substantial breach of a contract cannot maintain an action against the other contracting party for failure to perform." The determining factor in Michigan breach of contract cases . . . . is therefore whether a first breach is "substantial." The Michigan Supreme Court has explained that a "substantial breach" is one "where the breach has effected such a change in essential operative elements of the contract that further performance by the other party is thereby rendered ineffective or impossible, such as causing of a complete failure of consideration of the prevention of further performance by the other party."

*Chrysler Int'l Corp. v. Cherokee Export Co.*, 134 F.3d 738, 742 (6th Cir. 1998) (internal citations omitted).

Courts have recognized that where a contract expressly includes a notice and cure provision, a party failing to provide such is precluded from then subsequently suing for the other party for breaching the agreement. *See, e.g., Convergent Group Corp. v. County of Kent*, 266 F. Supp. 2d 647, 657-59 (W.D. Mich. 2003) (holding that where the plaintiff did not give notice and an opportunity to cure under the contract, it was prevented from suing for breach); *American Seating Co. v. Transp. Seating, Inc.*, 220 F. Supp. 2d 845, 847-49 (W.D. Mich. 2002) (same); *Frenchtown Dev. LLC v. Oerther Bros.*, No. 256656, 2005 WL 3304012, *3 n. 5 (Mich. Ct. App. Dec. 6, 2005) (unpublished) ("By not notifying defendants that they were in default, plaintiff denied defendants the opportunity to cure any defect or default with respect to a duty plaintiff had expressly reserved the right to waive").

Neither of Plaintiff's arguments overcomes the fact that it failed to adhere to the contract's express notice-and-cure provision – and thus was the first party to commit a material breach of the agreement. Under the clear and unambiguous terms of the contract, Plaintiff had an

obligation to provide written notice to Defendant of any problems with the project and to provide it a chance to cure. Instead, when the problems were discovered in May 2004, Plaintiff immediately hired a third party to evaluate and to install a new air condition system, and now seeks to impose those significant expenses on Defendant. Further, Plaintiff's November 2004 letter – some six months after the discovery of the HVAC problems, the retention of Petty, and completion of the remedial work – does not constitute "prompt notice" under the contract. Nor does Plaintiff's letter demanding 1.4 million dollars compensation constitute providing Defendant an opportunity to inspect, to repair, or to otherwise cure problems with the project.[2]

Therefore, since there is no genuine issue of material fact as to whether Plaintiff was the

---

[2] Defendant additionally argues that Plaintiff's claims should be dismissed since Plaintiff has failed to preserve the relevant evidence – here the original HVAC assembly – crucial to Defendant's defenses. Defendant contends that Plaintiff destroyed the original evidence with full knowledge that it intended to bring a lawsuit based on alleged design defects. Defendant claims that "[i]t is now *impossible* for [Defendant] to marshal the defense proofs necessary to rebut Mr. [Petty's] opinions based upon [Petty's] *exclusive* analysis of the HVAC system before it was destroyed, nor is it possible for [Defendant] to prepare defenses necessarily premised upon an assessment of the original systems as manufactured, installed and used before being removed and destroyed." (Def. Br. 17) (emphases in original).

Plaintiff responds that its claims concern the design of the HVAC system – and that the actual physical system is not necessary to evaluate the propriety of Defendants' architectural and design work. Plaintiff further contends: (1) that the absence of physical evidence did not prevent Defendant's experts from providing complete opinions on Plaintiff's claims; (2) that Defendant has not alternatively attempted to depose the contractors or individuals otherwise with firsthand knowledge of the installation and/or construction of the original HVAC systems; and (3) even if the Court were inclined to agree with Defendant concerning the necessity of the discarded systems, lesser sanctions would be appropriate in this case short of dismissal. (Pl. Br. 15-17).

Since the proper basis for dismissal of Plaintiff's breach of contract claim is the fact that it first materially breached the contract by failure to abide by the notice-and-cure provisions, the Court need not decide among possible sanctions for the failure to preserve evidence relevant to the instant case.

13

first to materially breach the contract, the Court GRANTS summary judgment to Defendant on the relevant portions of Plaintiff's Complaint.

### C. Unjust Enrichment

Defendant contends that Plaintiff cannot maintain an unjust enrichment claim when an express contract exists between the parties governing their relationship. Plaintiff responds that Defendant "disputes that certain contract documents govern, and thus, [Plaintiff] is warranted in pleading unjust enrichment as an alternative count to its breach of contract claim." (Pl. Br. 19) (internal citation omitted). Plaintiff refers to a portion of Defendant's answer where the latter claims that the "Purchase Requisition" does not govern the legal relationship between the parties. (Def. Answer ¶ 8).

> The Michigan Court of Appeals has spelled out the nature of an unjust enrichment claim:
>
> The theory underlying quantum meruit recovery is that the law will imply a contact in order to prevent unjust enrichment when one party inequitably receives and retains a benefit from another. "However, a contract will be implied only if there is no express contract covering the same subject matter." "Generally, an implied contract may not be found if there is an express contract *between the same parties on the same subject matter*."

*Morris Pumps v. Centerline Piping, Inc.*, 273 Mich. App. 187, 194 (2006) (internal citations omitted) (emphasis in original).

Defendant claims that an express contract governs their relationship. Plaintiff has not shown otherwise. Therefore, the Court GRANTS summary judgment to Defendant on Plaintiff's unjust enrichment claim.

### D. Completion of the Project within the Deadline

Defendant contends that Plaintiff cannot maintain a breach of contract claim based upon failure to complete the project on time, since Defendant met its January 15, 2004 deadline. (Def. Br. 20). Plaintiff acknowledges that the project was completed on time, yet argues:

> [Plaintiff] has elected not to pursue damages resulting from [Defendant's] delays and [Plaintiff] has previously alerted [Defendant] of this decision on several occasions. However, [Plaintiff] remains entitled at trial to proffer evidence of the delays caused by [Defendant] to demonstrate [Defendant's] overall deficiencies during the design phase of the Project.

(Pl. Br. 20) (internal citation omitted).

The Court finds that Defendant fulfilled its contractual obligation to complete the project as scheduled in the contract. Plaintiff's argument here is better addressed as an evidentiary issue at trial. Therefore, the Court GRANTS summary judgment to Defendant on this portion of Plaintiff's claim.

## III. CONCLUSION

Accordingly, the Court hereby:

(1) **GRANTS** summary judgment to Defendant on Complaint paragraphs 20, 32, 43, 45-47, 50, <u>52</u>, 55(a)-(f), (h), (i), (m), 56, 59(b) & (e), and 60; and

(2) **GRANTS** summary judgment to Defendant on Plaintiff's unjust enrichment claim.

**SO ORDERED.**

s/Paul D. Borman<br>
PAUL D. BORMAN<br>
UNITED STATES DISTRICT JUDGE

Dated: March 25, 2008

CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record by electronic means or U.S. Mail on March 25, 2008.

                                                  s/Denise Goodine
                                                  Case Manager